UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

TANYA E HALL                                CIVIL ACTION NO.  6:22-CV-05913

VERSUS                                      JUDGE DONALD E. WALTER

KILOLO KIJAKAZI                             MAGISTRATE JUDGE DAVID J. AYO

## REPORT AND RECOMMENDATION

Before the Court is an appeal by Claimant Tanya Hall of the Commissioner's finding of non-disability.  The Court has considered the administrative record, the parties' briefs, and the applicable law, and recommends that the Commissioner's decision be vacated and remanded to the Commissioner for further proceedings consistent with the views expressed herein.

## Administrative Proceedings

Claimant fully exhausted her administrative remedies before filing this action. She filed an application for disability insurance benefits on January 30, 2020, alleging disability beginning on January 30, 2017.  (Rec. Doc. 8-1, p. 171).  Her application was denied on September 23, 2020. (Rec. Doc. 8-1, p. 76).  She filed a Request for Reconsideration (Rec. Doc. 8-1, p. 81), which was denied by Notice of Reconsideration on February 26, 2021. (Rec. Doc. 8-1, p. 87).  Claimant then requested a hearing, which was held by telephone due to the "extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) pandemic" before Administrative Law Judge Carol Latham on October 22, 2021. (Rec. Doc. 8-1, p. 29 *et seq*).  The ALJ issued a decision on April 20, 2022, concluding that Claimant was not disabled within the

meaning of the Social Security Act from the claimed disability onset date of January 30, 2017, through the date of the decision. (Rec. Doc. 8-1, pp. 16-24).   Claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review. (Rec. Doc. 8-1, p. 5). Therefore, the ALJ's decision became the Commissioner's final decision for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).   Claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Claimant was born on December 30, 1971.  She was 46 years old on the alleged disability onset date and 52 years old at the time of the ALJ's decision.  She has a high school diploma and four years of college, and her work history includes employment as a teacher's assistant, a dispatcher at a trucking company, and a manager at a radio station.  (Rec. Doc. 8-1, pp. 207, 222).  She alleged that she has been disabled since January 30, 2017, due to fibromyalgia, rheumatoid arthritis, anxiety, bipolar disorder, a back injury, and chronic asthma issues. (Rec. Doc. 8-1, p. 210).

The record reveals the following pertinent history:

### I.   Claimant's Medical Records:

### A.   Doctor's Medical Center of Modesto, California – Emergency/Urgent Care ("DMC"):

- September 30, 2016 (Rec. Doc. 8-1, pp. 515-577) – Claimant sought treatment at DMC.  She reported "worsening all over body aches."  She also reported that she had been diagnosed with neuropathy and that she had severe anxiety and PTSD from an abusive marriage of 20 years.  She reported that the neuropathy had gotten worse, and she became dizzy and fell, hitting the left side of her head.  She also reported abdominal pain and back pain.  She was using a cane and claimed that the pain medications were not helping her pain.  An

ecchymoses (discoloration) was noted on her left cheek and she stated that she had "hit the BBQ [pit] the previous weekend." Her pain was charted as 10/10 and sharp. Morphine, Zofran ODT and Norco were administered, and she was discharged with instructions to follow-up with her primary medical doctor (PMD) and to return to the emergency department (ED) if her symptoms worsened. Dr. Chen Lee diagnosed her with arthritis, fibromyalgia, anxiety as well as neuropathy. He noted "tenderness on her muscles" and "trigger points everywhere." (Rec. Doc. 8-1, pp. 538-539). She was prescribed Norco, Baclofen, and Docusate.

- <u>November 4, 2016</u> (Rec. Doc. 18-1, pp. 439-513) – Claimant sought treatment at DMC. She reported that she was having chest pain for two days and had constant chronic pain which began three months prior. She reported that she had seen multiple doctors and was diagnosed with lupus, fibromyalgia, and neuropathy and that she could renew her prescription of Gabapentin in three days. She reported that Norco did not relieve her pain. She was diagnosed with anxiety, neuropathy, fibromyalgia, and lupus. She was discharged with instructions to follow-up with her PMD and was prescribed Robaxin, Norco, Baclofen, and Docusate.

- <u>February 17, 2017</u> (Rec. Doc. 18-1, pp. 352-436) – Claimant sought treatment at DMC. Her family reported that she went to her primary care provider (PCP) the day before and he had added a prescription of Seroquel and an increased dose of Amitriptyline. They were concerned that she may have overdosed on medication as she had been confused and unable to speak since the day before, she had fallen twice, and had had a seizure. A nurse noted that she was unintelligible and grunting at times. (Rec. Doc. 8-1, p. 431). Dr. Philip Chan noted that: "45 [year old] with extensive psychiatric [history] presents with [altered mental state].' (Rec. Doc. 8-1, p. 387). She was diagnosed with psychiatric disorder, pseudo seizures, and conversion disorder and her family members were instructed to follow-up with the PCP within one to two days. *Id.*

B. <u>Aspen Family Medical Group Inc., Modesto, California (Aspen):</u>
- <u>January 23, 2019</u> – Claimant presented at Aspen, and it is noted she wanted to talk about mental problems. Depression and fibromyalgia were diagnosed, and Lexapro, Gabapentin, and Trazadone were prescribed. (Rec. Doc. 8-1, pp. 597-598).
- <u>January 29, 2019</u> – Claimant presented at Aspen with upper respiratory infection (URI) and to talk about medications. Although the notes are unclear, it appears that prescriptions for URI were given and medications for depression were adjusted. (Rec. Doc. 8-1, pp. 595-596).

- <u>February 12, 2019</u> – Claimant presented at Aspen for follow-up appointment regarding medications. Her blood pressure had increased to 150/100. Although the notes are unclear, it appears that prescriptions were refilled. (Rec. Doc. 8-1, pp. 593-594).
- <u>February 25, 2019</u> – Claimant presented at Aspen and blood pressure had increased again to 170/100. Although the notes are unclear, it appears that prescriptions were refilled. (Rec. Doc. 8-1, pp. 591-592).
- <u>March 13, 2019</u> – Claimant presented at Aspen and wanted to talk about her blood pressure. Although the notes are unclear, it appears that prescriptions were refilled. (Rec. Doc. 8-1, pp. 589-590).
- <u>March 31, 2019</u> – Claimant presented at Aspen to follow-up with the doctor regarding blood pressure and depression. Prescriptions were refilled. (Rec. Doc. 8-1, pp. 587-588).
- <u>June 6, 2019</u> – Claimant presented at Aspen where laboratory tests were performed, and prescriptions were refilled. (Rec. Doc. 8-1, pp. 585-586, 599-603).

<u>C. Dr. Reginald P. Segar - Family Practice, Eunice, Louisiana</u>[1]:
- <u>October 24, 2019</u> – Claimant sought a wellness exam. Dr. Segar diagnosed her with pulmonary hypertension, fibromyalgia, and bipolar disorder. It is noted that her medications needed to be refilled and Dr. Segar referred to a medication list. (Rec. Doc. 8-1, p. 643).
- <u>January 17, 2020</u> – Claimant presented for follow-up appointment. Dr. Segar diagnosed her with dyslipidemia, fibromyalgia, and bipolar disorder. It was noted that her medications needed to be refilled. (Rec. Doc. 8-1, p. 642).
- <u>January 27, 2020</u> – Claimant presented with upper back pain. Dr. Segar added a diagnosis of bilateral rheumatoid arthritis and myofascial spasms. It was noted that her medications needed to be refilled. (Rec. Doc. 8-1, p. 641).
- <u>February 3, 2020</u> – Claimant presented with upper back pain. Dr. Segar added a diagnosis of bilateral rheumatoid arthritis and myofascial spasms. It was noted that her medications needed to be refilled. (Rec. Doc. 8-1, p. 640).
- <u>February 6, 2020</u> – Claimant returned to Dr. Segar. The reason for the return visit is unclear. (Rec. Doc. 8-1, p. 639).
- <u>February 11, 2020</u> – Dr. Segar noted that Claimant's body mass index (BMI) is 32. (Rec. Doc. 8-1, p. 635).
- <u>February 27, 2020</u> – Claimant presented with wheezing and shortness of breath. Dr. Segar added a diagnosis of chronic obstructive pulmonary disease (COPD). Her medication list was

---

[1] The Court notes that the notes are handwritten and difficult to read.

noted. (Rec. Doc. 8-1, p. 634).

- <u>April 24, 2020</u> – Claimant presented with mental issues.  Dr. Segar noted that she was gaining weight (had gained twenty pounds since January) and noted her bipolar disorder.  He added a diagnosis of depression and added Tramadol and Cymbalta as well as two other medications. (Rec. Doc. 8-1, p. 632).
- <u>June 18, 2020</u> – Claimant presented for a follow-up regarding her fibromyalgia.  Dr. Segar noted fibromyalgia, bipolar disorder, and COPD. (Rec. Doc. 8-1, p. 631).
- <u>July 15, 2020</u> – Claimant presented for a follow-up appointment to refill her medications. Dr. Segar noted fibromyalgia, bipolar disorder, and COPD. (Rec. Doc. 8-1, p. 630).
- <u>July 22, 2020</u> – Claimant presented for a follow-up appointment to refill her medications. Dr. Segar noted fibromyalgia, bipolar disorder, and COPD. (Rec. Doc. 8-1, p. 629).
- <u>August 19, 2020</u> – Claimant presented for a follow-up appointment to refill her medications. Dr. Segar noted anxiety as well as bipolar disorder. (Rec. Doc. 8-1, p. 628).
- <u>September 10, 2020</u> – Claimant presented for a follow-up appointment to refill her medications. Dr. Segar noted anxiety as well as bipolar disorder. (Rec. Doc. 8-1, p. 627).
- <u>October 8, 2020</u> – Claimant presented for a follow-up appointment to refill her medications. Dr. Segar noted her weight gain could be caused by Seroquel and it appears he adjusted her medications. (Rec. Doc. 8-1, p. 626).
- <u>November 5, 2020</u> – Claimant presented for a follow-up appointment to refill her medications. Dr. Segar noted she was still on Seroquel. He added a diagnosis of insomnia. (Rec. Doc. 8-1, p. 625).
- <u>December 7, 2020</u> – Claimant presented for a follow-up appointment to refill her medications. (Rec. Doc. 8-1, p. 659).
- <u>January 5, 2021</u> – Claimant presented for a follow-up appointment to refill her medications and complained of pain noting that it was so severe that she went to South Star Urgent Care (see below). (Rec. Doc. 8-1, p. 658).
- <u>February 2, 2021</u> – Claimant presented for a follow-up appointment to refill her medications and complained of anxiety which the medication did not help.  Dr. Segar noted that she reported three to four panic attacks a week and back pain.  He added anxiety attacks to the diagnosis. (Rec. Doc. 8-1, p. 657).
- <u>February 10, 2021</u> – Claimant presented for a follow-up appointment.  It is unclear but it appears that Dr. Segar noted that she reported three to four panic attacks a week and back pain.  He added anxiety attacks to the diagnosis. (Rec. Doc. 8-1, p. 342).
- <u>March 2, 2021</u> – Claimant presented for a follow-up appointment.  Dr

Segar noted that her anxiety was bad, and that her BMI is 35. (Rec. Doc. 8-1, p. 655).

- <u>March 31, 2021</u> – Claimant presented for a follow-up appointment. Dr. Segar noted that her bipolar disorder was stable. The notes regarding her depression are difficult to read. (Rec. Doc. 8-1, p. 654).
- <u>April 28, 2021</u> – Claimant presented for a follow-up appointment. (Rec. Doc. 8-1, p. 652).
- <u>May 19, 2021</u> – Claimant presented for a follow-up appointment. Dr. Segar noted that her bipolar disorder was stable. The notes regarding her depression are difficult to read. (Rec. Doc. 8-1, p. 651).
- <u>June 23, 2021</u> – Claimant presented for a follow-up appointment. The notes regarding her anxiety are difficult to read. (Rec. Doc. 8-1, p. 650).
- <u>July 22, 2021</u> – Claimant presented for a follow-up appointment. The notes regarding her anxiety and bipolar disorder stated "under control." (Rec. Doc. 8-1, p. 649).
- <u>August 19, 2021</u> – Claimant presented for a follow-up appointment to refill medications. (Rec. Doc. 8-1, p. 648).
- <u>September 17, 2021</u> – Claimant presented for a follow-up appointment to refill medications. A list of medications was attached. (Rec. Doc. 8-1, pp. 646, 647).
- <u>October 18, 2021</u> – Claimant presented for a follow-up appointment to refill medications. (Rec. Doc. 8-1, p. 645).

D. <u>South Star Urgent Care</u>:
- <u>October 11, 2019</u> – Claimant was seen and medications were refilled for anxiety disorder, major depressive disorder, and hypertension. Treated for pain, gastritis, and kidney stones. (Rec. Doc. 8-1, pp. 620-621).
- <u>December 5, 2020</u> – Claimant was seen and medications were refilled for anxiety disorder, major depressive disorder, and hypertension. The clinic noted that it would not refill prescription for Tramadol because the clinic did not treat chronic pain. (Rec. Doc. 8-1, pp. 618-619).

## II. **Prescription Records – CVS Pharmacy Modesto, California (Rec. Doc. 8-1, at pp. 295-299)**
- <u>October 27, 2016</u> - Methylprednisolone prescribed by Melvi. I. Nario.[2]
- <u>March 15, 2017 to February 7, 2018</u> - Lorazepam, Venlafaxine, Baclofen, Gabapentin, Zolpidem Tartrate, Diclofenac, Divalproex and Trazodone prescribed by Nico. McLawrence.
- <u>October 23, 2017</u> – Quetiapine Fumarate prescribed by Jonat T.

---

[2] The names of the prescribing health providers Melvi. I. Nario, Nico. McLawrence and Math. F. Freitas are incomplete due to the spacing on the chart provided by CVS.

Cheang.

- <u>January 23, 2019 to July 18, 2019</u> - Escitalopram, Trazodone, Quetiapine Fumarate, Gabapentin, Duloxetine, Amlodipine Besylate, Propranolol, Fluticasone propionate prescribed by Math. F. Freitas.
- <u>January 23, 2019 to July 18, 2019</u> - Escitalopram, Trazodone, Quetiapine Fumarate, Gabapentin, Duloxetine, Amlodipine Besylate, Propranolol, Fluticasone propionate prescribed by Math. F. Freitas.

## III.  <u>Prescription Records – Bellard's Family Pharmacy (Rec. Doc. 8-1, at pp. 295-299)</u>

- <u>January 20, 2020 to August 19, 2021</u> - A total of 302 prescriptions, including many of the drugs prescribed above prescribed by Dr. Reginald Segar.

## IV.  <u>Medical Source Statement (Physical) by Dr. Segar (February 6, 2020)</u>

Dr. Segar's Medical Source Statement, which was provided after he had seen Claimant five times, stated that the Claimant could, within an eight-hour workday, sit occasionally, walk infrequently, and never stand. (Rec. Doc. 8-1, pp. 303-304). Dr. Segar further opined that she could never lift any amount (not even one to five pounds), and that she had serious postural and manipulative limitations (including that she could never use her hands for gross manipulation or climb or stoop). *Id.* In addition, Dr. Segar opined that Claimant would miss work about four days per month because of her medical conditions. Dr. Segar also noted that Claimant experiences extreme pain and would be off task 70% of the workday because of pain. *Id.* He added that she must elevate her legs and lie down for multiple periods throughout the day and would need to take unscheduled break periods. *Id.*

## V.  <u>Consultive Examination Report – Med Plus, Opelousas, Louisiana – Dr. Justin Creel (September 11, 2020)</u>

Dr. Creel performed a disability determination on Claimant at the request of Disability Determination Services.  He noted that Claimant reports pain in lumbar vertebrae, that she had been diagnosed with rheumatoid arthritis and fibromyalgia as well as depression and panic attacks, and that she had attempted suicide at least once.  (Rec. Doc. 8-1, pp.  328).  He opined that she exhibited essentially normal physical examination findings and noted that she demonstrated no clinical deficits in strength, sensation, or gait.  (Rec. Doc. 8-1, pp.  328-334).  In reviewing her past medical history, he noted that she had "major surgery [back] [i]n 2009" and that she "has a history of depression and panic attacks. She has no history of bipolar and anxiety syndrome." *Id*.  His clinical impressions were fibromyalgia, major depressive disorder, anxiety, and degenerative disc disease. *Id*.  He found that based on the "available medical history and objective medical findings, this claimant has no limitations on ability to sit, stand, walk, bend or stoop, reach, carry, see, hear, or with memory or understanding." *Id*.

## VI.   **State Agency Consultants**

The state agency medical consultants, Jeffrey Falludi (medical specialist) on September 23, 2020, and Dr. Hollis T. Rogers on February 26, 2021, after request for reconsideration, determined that Claimant had no severe physical or psychological impairment. (Rec. Doc. 8-1, pp. 63-72).  The consultants agreed with the Consultive Examiner Dr. Creel and his September 11, 2020, examination, which found that Claimant had normal clinical findings and unremarkable radiographic studies of her

lumbar and cervical spine.  (Rec. Doc. 8-1, pp. 63, 69).  Regarding Dr. Segar's Medical

Source Statement, the examiner noted;

> REGINALD SEGAR MD
> 10/24/19-4/24/20 PNs show diagnosis of Fibromyalgia,
> Bipolar disorder, Anxiety, HTN, COPD, and obesity.
> However, notes are poorly written and contain no objective
> findings other than 148/98 BP, BMI 32, HDL labs 421. Pain
> in UE and tenderness within the body noted.

*Id.*

Falludi further found that "based on the available medical history and

objective clinical findings, this claimant has no limitations on ability to stand, sit,

walk, bend. She ambulates without difficulty and without assistive device." (Rec. Doc.

8-1, p. 64).  On reconsideration Dr. Hollis found that Claimant "has no limitations on

ability to stand, sit, walk, bend or stoop, reach, handle, lift, carry, see, hear or with

memory or understanding." (Rec. Doc. 8-1, p. 72).

## VII.  <u>Testimony at telephone hearing before the ALJ on October 22, 2021</u>

Claimant testified that she stopped working because of her back pain, which

is exacerbated by sitting and standing, that that her fibromyalgia makes her

condition worse, and that sometimes she cries because of the pain.  (Rec. Doc. 8-1, p.

35).  Claimant explained that she can sit and stand for about 30 minutes each before

having to change her position and that she uses a cane to walk.  (Rec. Doc. 8-1, at p.

37, 42).  She further testified that for her physical pain she has been treated with

injections and medication and that for her mental issues she has been in and out of

therapy since she was sixteen and takes medication. (Rec. Doc. 8-1, at pp. 43, 44).

The ALJ found Claimant was not disabled. Claimant now seeks reversal of the Commissioner's adverse ruling.

## Discussion

### A.    Standard of Review

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence. *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted). The Supreme Court has emphasized that:

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." It means— and means only— "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, (2019) (internal citations omitted). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. *Joubert v. Astrue*, 287 F. App'x 380, 382 (5th Cir. 2008) (citing *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

The United States Supreme Court defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations. *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983). In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed unless the Commissioner applied an incorrect legal standard that materially influenced the decision. *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the Claimant's subjective evidence of pain and disability, and (4) the Claimant's age, education, and work experience. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

**B.**    **Entitlement to Benefits**

The Disability Insurance Benefit program provides income to individuals who

are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). *See also Smith v. Berryhill*, 139 S. Ct. 1865, 1772 (2019). A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

    C.    **Evaluation Process**

        1. Burden of Proof

A claimant is "disabled" as defined in the Social Security Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A sequential five-step inquiry is used to determine whether a claimant is disabled. The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or

medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

The step two question is a "de minimis screening device to dispose of groundless claims." *Johnson v. Astrue*, 2010 WL 148411, at *16 (S.D. Tex. Jan. 11, 2010) (quoting *Smoven v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54 (1987)). The bar is low: "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).

As emphasized by the Fifth Circuit, the specific meaning of "severe impairment" may be "somewhat surprising" under its binding precedent. *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018). As has been the case since the Fifth Circuit decided the often-cited decision in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), "[a]n impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Id*. at 1101. "Re-stated, an impairment is severe if it is anything more than a 'slight abnormality' that 'would not be expected to interfere' with a claimant's ability to work." *Salmond*, 2018 WL 3015052, at *3 (quoting *Loza v. Apfel,* 219 F.3d 378, 391 (5th Cir. 2000)). Under Fifth Circuit precedent, a claimant

need only "make a de minimis showing" to proceed past Step 2 of the evaluative sequence. *Id.* (citing *Anthony v. Sullivan*, 954 F.2d 289, 293 n.5 (5th Cir. 1992)). "Because step two is to be rarely utilized as [a] basis for the denial of benefits, its invocation is certain to raise a judicial eyebrow." *Craig v. Berryhill*, 2019 WL 1387696 (M.D. La. March 27, 2019), *Parker v. Commissioner of the Social Sec.*, 2014 WL 1239776, at * 4 (M.D. La. March 25, 2014) (quoting *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 361 (3d Cir. 2004)). *See also Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988) ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.").

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520I.

"The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step." *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the

Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d at 461; *Fraga v. Bowen*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

2. <u>Pain</u>

The Court recognizes that pain can constitute a disabling impairment, but only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment. *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985). Subjective complaints of pain must be corroborated by objective medical evidence. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain does not take precedence over conflicting medical evidence. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989).

The ALJ's decision regarding the actual extent of a claimant's complaints of pain is entitled to considerable judicial deference if supported by substantial evidence. *Wren v. Sullivan*, 925 F.2d at 128. Factors that the ALJ may consider in evaluating the claimant's subjective complaints include: (1) the claimant's daily activities; *Falco v. Shalala*, 27 F.3d at 163; *Anthony v. Sullivan*, 954 F.2d 289, 296 (5th Cir. 1992); (2) medication the claimant takes for pain; *Anthony v. Sullivan*, *supra*; *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); (3) degree of medical

treatment; *Villa*, *supra*; *Nickerson v. Secretary of Health and Human Services*, 894 F. Supp. 279 (E.D. Tex. 1995); (4) lack of medical opinions in the record indicating the claimant is precluded from performing the level of activity indicated by the ALJ; *Villa*, *supra*; and (5) external manifestations of debilitating pain such as marked weight loss. *Falco*, *supra*; *see also* 20 C.F.R.§§ 404.1529I(3)(i)-(vii).[3]

D.    **The ALJ's Findings and Conclusions**

The ALJ made the following findings:

- At step one, that Claimant has not engaged in substantial gainful activity from her alleged onset date of January 30, 2017. (Rec. Doc. 8-1, pp. 19). This is supported by substantial evidence in the record.

- At step two, that Claimant has the following medically determinable impairments: fibromyalgia, chronic obstructive pulmonary disease (COPD), osteoarthritis, obesity, depressive/anxiety disorder, bipolar disorder, and hypertension (20 CFR 404.1521 et seq.); however, but no impairment or combination of impairments has significantly limited (or is expected to significantly limit) the ability to perform basic work-

---

[3] "Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

related activities for 12 consecutive months. Therefore, the ALJ concluded that Claimant does not have a severe impairment or combination of impairments. (Rec. Doc. 8-1, p. 19). The ALJ further found Claimant "not disabled" and denied disability insurance benefits. (Rec. Doc. 8-1, p. 24).

Consequently, the evaluation ended at step two and the Court now limits its review to the appropriateness of the step two decision.

The ALJ found that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, that the Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record." (Rec. Doc. 8-1, p. 20).

In particular, regarding Claimant's physical limitations, the ALJ found as follows

> In 2019, 2020, and 2021, Ms. Hall exhibited again physical examination findings, within normal limits, except with regards to examinations performed by Dr. Segar (Exhibits 2F/4-5, 9, 13; 4F/6-7; 6F/4, 6, 8, 10, 12, 14, 16; 8F/3, 7; 9F/1, 6, 11, 20, 23, 24-25, 30-32). It also bears noting that the claimant has not generally exhibited clinical deficits in respiratory functioning, during the relevant period. However, with regards to examinations performed by Dr. Segar, treatment notes indicate that Ms. Hall exhibited tenderness and/or pain either throughout her body, or particular to her back or right upper arm (Exhibits 2F/3, 6-8, 10-11-12, 14; 4F/3-5; 9F/2-5, 9, 15-19, 21, 28, 33-34). Despite this, the undersigned finds it notable that the claimant has generally exhibited no clinical deficits in musculoskeletal functioning except during clinical examinations performed by Dr. Segar, even in other clinical examinations performed during the same period. For example, during her September 2020 consultative examination (which pertains to a period during which the claimant was examined by Dr. Segar), the claimant exhibited essentially normal physical examination findings. She demonstrated a normal gait, with no evidence of scoliosis, kyphosis,

> or spasm of the paraspinous muscles. In addition, Ms. Hall exhibited normal fine and gross manipulation bilaterally, with no evidence of muscular atrophy. Moreover, she demonstrated full (5/5) motor strength, intact sensation, and normal range of motion in her spine and extremities. Lastly, radiographic studies of the claimant's lumbosacral and cervical spine, performed by the consultative examiner, were unremarkable (Exhibit 3F/6)

(Rec. Doc. 8-1, at pp. 20, 21).

In particular, regarding Claimant's mental condition, the ALJ found

> that she has been treated for bipolar disorder, and anxiety/depression (Exhibits 2F/4-6, 12-14; 4F/6; 8F/6; 9F/4, 6, 19). However, Ms. Hall's symptoms appear to be well-controlled by her medication, as she has exhibited mental status examination findings within fairly normal limits, with no documented clinical deficits in memory, concentration, attention, behavior, or orientation (Exhibits 3F/5-6; 8F/7). Moreover, the claimant has been able to communicate effectively with treatment providers and examiners and has been noted as cooperative. Considering all these things, the medical evidence of record simply does not establish that Ms. Hall's mental impairments cause her significant work-related limitations. Accordingly, her mental impairments, even in combination, are considered non-severe.

(Rec. Doc. 8-1, at p. 21).

The ALJ further found persuasive Dr. Creel's opinions and the findings and opinions of the state agency medical consultants, who based their opinions on Dr. Creel's September 2020 examination and found that

> [w]hile the medical evidence indicates that the claimant has had some joint pain and tender points during her physical examination with Dr. Segar, these symptoms were either not observed or not documented with regards to examinations performed by other medical physicians or treatment providers.

*Id.*

### E.   Claimant's Allegations of Error

Claimant asserts that the ALJ's finding that her impairments, singly and in

combination, do not cause more than minimal impairment of her ability to work is contrary to law and not supported by substantial evidence.

## Analysis

As discussed above, despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. *Joubert v. Astrue*, 287 F. App'x 380, 382 (5th Cir. 2008).  In doing so the Court finds the following significant:

    1.  Evidence of Missing Medical Records

The earliest medical records obtained are from an emergency room visit at DMC in Modesto, California on September 30, 2016, where Claimant reported she had been diagnosed with neuropathy and that she had severe anxiety and PTSD from an abusive marriage of 20 years.  (Rec. Doc. 18-1, pp. 515-577).  She was using a cane and claimed that the pain medications were not helping her pain. *Id.*  The next record is from November 4, 2016, where Claimant reported that she was having chest pain for two days and had constant chronic pain which began three months prior. (Rec. Doc. 18-1, pp. 439-513).  She reported that she had seen multiple doctors and was diagnosed with lupus, fibromyalgia, and neuropathy and that she could renew her prescription of Gabapentin in three days.  The next record is from the same emergency room on February 17, 2017, where it appears that Claimant had a significant mental health issue or event with a possible overdose and/or suicide attempt. (Rec. Doc. 18-1, pp. 352-436).  Her family reported that she went to her primary care provider the day before and that he had added a prescription of Seroquel

and an increased dose of Amitriptyline. (Rec. Doc. 8-1, p. 387).  Dr. Philip Chan noted that "45 [year old] with extensive psychiatric [history] presents with [altered mental state]." *Id.*  She was diagnosed with psychiatric disorder, pseudo-seizures, and conversion disorder and her family members were instructed to follow-up with the PCP within 1-2 days. *Id.*

The records from DMC allude to other doctors who had diagnosed physical and mental issues and prescribed medications from about four months before the alleged onset date of disability to one month after.  There are no records from these health care providers.  In addition, eighteen days after Claimant alleges that her onset of disability began her most significant recorded mental health event occurred on February 17, 2017.  It was reported that Claimant had been confused and unable to speak since the day before, had fallen twice, had had a seizure, was unintelligible and grunting at times, and was directed to see her PCP. (Rec. Doc. 8-1, p. 431).  However, there is a gap in the records from February 17, 2017 until January 23, 2019, when Claimant presented at Aspen seeking help for mental problems.  (Rec. Doc. 8-1, p. 597-598).

The CVS prescription records from that time period reveal the following:

- On October 27, 2016, Melvi. I. Nario-prescribed Methylprednisolone.

- From March 15, 2017 to February 7, 2018, Nico. McLawrence prescribed Lorazepam, Venlafaxine, Baclofen, Gabapentin, Zolpidem Tartrate, Diclofenac, Divalproex and Trazodone.

- On October 23, 2017, Jonat T Cheang prescribed Quetiapine

Fumarate.

- From January 23, 2019 to July 18, 2019, Math. F. Freitas prescribed Escitalopram, Trazodone, Quetiapine Fumarate, Gabapentin, Duloxetine, Amlodipine Besylate, Propranolol, and Fluticasone Propionate.

No medical records from any of the health care providers who prescribed the above listed medications are contained in the record.

Finally, as noted by Claimant,

> The record before the ALJ includes a 2016 ER visit containing the differential diagnoses of arthritis, fibromyalgia, anxiety, and possible neuropathy. Tr. 535. Although not part of the record, this ER visit refers to radiology, a CT of the head and cervical spine which documented "some DJD" (degenerative joint disease).

(Rec. Doc. 9, at p. 5 fn.8 citing Rec. Doc. 8-1, at pp. 539, 540).  Although Claimant's back surgery in 2009 is mentioned numerous times and she testified that her back issues caused her to stop working, these records are not included in the record.

### 2.  Evaluation by Dr. Justin Creel and State Examiners

The ALJ found persuasive the September 11, 2020, opinion of Dr. Justin Creel[4] and the state examiners who based their opinion on this examination.  It is unclear from the record whether Dr. Creel reviewed Claimant's medical records from California or from Dr. Segar, but Dr. Creel emphasized that Claimant had not been to the emergency room in two years and had not had any recent hospitalizations. (Rec. Doc. 8-1, at pp. 626 - 630).  The Court notes that this evaluation was three and a half

---

[4] Claimant identifies Dr. Creel as a dermatologist which is undisputed by the Commissioner. (Rec. Doc. 9, at p. 5).

years after the significant mental health event of February 17, 2017, and that the records from Dr. Segar at the time do not reveal that Claimant's physical or mental distress was elevated at the time of the evaluation.  (Rec. Doc. 8-1, at p. 329).  In addition, Dr. Creel stated Claimant "has a history of depression and panic attacks. She has no history of bipolar and anxiety syndrome." (Rec. Doc. 8-1, pp.  328-334).  It is unclear whether Dr. Creel was not informed of Claimant's diagnosis of bipolar disorder or whether this is a scrivener's error.  The Court also notes that the medical records received from DMC, Aspen, and Dr. Segar, as well as the drugs prescribed, are evidence of a bipolar diagnosis.  The Court also notes that a significant part of the medical records from Dr. Segar occurred after the Dr. Creel's evaluation.

As explained above, the state agency medical consultants determined that Claimant had no severe physical or psychological impairment. (Rec. Doc. 8-1, pp. 63-72).  The consultants relied on Dr. Creel's opinion of and noted that Dr. Segar's records were "poorly written." (Rec. Doc. 8-1, at pp. 62, 69).  However, it appears that the examiners did not have Claimant's records from DMC, Aspen, CVS, Bellard Pharmacy, or SouthStar Urgent Care. *Id.*

3. Lack of In-Person Observation by ALJ

Due to the extraordinary circumstances associated with the COVID-19 Pandemic, the hearing before the ALJ was held by phone almost two years after Claimant filed her application for benefits.  While the Court is aware of the need for telephone hearings and that Claimant agreed to the telephone hearing, the Court is also aware that certain observations and assessments cannot be over the telephone.

In this instance, the ALJ asked Claimant about her use of a cane and was told that her doctor had not prescribed it but that he was going to prescribe one if she was not already using one and that she uses it on "bad days" because she is afraid of falling. (Rec. Doc. 8-1, at p. 42.)   There is also evidence in the record from DMC of her using a cane and of her falls.  (*See* Medical Records above).  Although Dr. Creel references in the medical history section of his report that Claimant "states that she uses a cane to ambulate," he does not mention it in his conclusions. (Rec. Doc. 8-1, p.328).  The ALJ does not address this in the decision.  As stated above, the ALJ found "Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record."  While it is in the province of the ALJ to determine credibility, in this instance an in-person observation of Claimant would have shed light on this discrepancy.

4. <u>Medical Records</u>

Claimant argues that the ALJ concedes that medical records from Dr. Segar described more than minimal limitations–directly contrary to the ALJ's hearing findings–and that this is significant given that Dr. Segar's record comprises a significant portion of the record.  (Rec. Doc. 9, at p. 8).  Claimant further asserts that records from Aspen describe treatment in 2019 for fibromyalgia and hypertension treated with medication as well as depression and insomnia with clinical findings of poor balance, abnormal gait, and reflex disturbance. (Rec. Doc. 8-1, at pp. 593, 597).  Claimant also notes that records from SouthStar Urgent Care document ongoing

assessment and treatment for depression and anxiety disorder (Rec. Doc. 8-1, at pp. 618-624).

As stated above, in February of 2020 Dr. Segar stated that Claimant could, within an eight-hour workday, sit occasionally, walk infrequently, and never stand. (Rec. Doc. 8-1, pp. 303-304). In addition, Dr. Segar opined that Claimant would miss work about four days per month because of her medical conditions and that Claimant experiences extreme pain and would be off-task 70% of the workday because of pain. *Id*. He added that she must elevate her legs and lie down for multiple periods throughout the day and would need to take unscheduled break periods. *Id*.    In September of 2020, Dr. Creel concluded that Claimant had no limitations.  The state examiners found Dr. Creel's opinion persuasive and found that Claimant had no limitations or severe impairments.

The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits. *Ripley*, 67 F.3d at 557.  If the ALJ does not satisfy his duty, his decision is not substantially justified. *Id*.  Reversal of his decision, however, is appropriate only if the applicant shows prejudice. *Id*.  The record contains ample evidence of Claimant's physical issues, including evidence of ambulatory issues and risks of falling, and mental health issues including panic attacks and at least one suicide attempt which occurred after the onset of disability.  The record also contains ample evidence that Claimant sought treatment for pain and mental health issues, was prescribed medication for these issues, and continuously used this medication.

In addition, there are clearly health care providers who were not contacted to provide medical records.

On the present record, the Court is constrained to conclude that the ALJ's finding that no impairment or combination of impairments has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months and that Claimant does not have a severe impairment or combination of impairments is not supported by substantial evidence. The Court notes that the specific meaning of "severe impairment" may be "somewhat surprising" under its binding precedent. *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018). "Re-stated, an impairment is severe if it is anything more than a 'slight abnormality' that 'would not be expected to interfere' with a claimant's ability to work." *Salmond*, 2018 WL 3015052, at *3 (quoting *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000). Accordingly, the Court does not find substantial evidence to find that Claimant has failed to make a "*de minimis* showing" to proceed past Step 2 of the evaluative sequence. *Id.* (citing *Anthony v. Sullivan*, 954 F.2d 289, 293 n.5 (5th Cir. 1992)).

The ALJ did not observe Claimant and relied on a one-time examination by a dermatologist (Dr. Creel) and the opinions of state examiners who did not observe Claimant. The ALJ did not discuss the significant mental health event which occurred less than a month after the alleged onset of disability date and did not request records from the health providers referenced in the records from DMC or CVS.

## Conclusion and Recommendation

For the reasons discussed above, this Court recommends that the Commissioner's decision be reversed and remanded for additional proceedings. In these additional proceedings, the evidence regarding the Claimant's use of a cane, her falls, and the medical evidence from 2016–2019 should be considered. Additionally, Claimant's subjective complaints of pain should be evaluated, and medical records from the health providers from 2016–2019 should be requested and considered.

\* \* \* \* \*

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual

findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[5]

      Signed at Lafayette, Louisiana on this 6th day of March, 2024.

_____
DAVID J. AYO
UNITED STATES MAGISTRATE JUDGE

---

[5] *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).